1
2
3
4
5
6
7
8

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC T. THOMPSON, | CASE NO. CV F 05-1432 LJO |
| Plaintiff, | **DECISION ON SOCIAL SECURITY COMPLAINT** |
| vs. | (Docs. 12, 13.) |
| JO ANNE B. BARNHART,<br>Commissioner of Social<br>Security, | |
| Defendant. | |
| _____/ | |

## **INTRODUCTION**

Plaintiff Eric T. Thompson ("plaintiff") seeks this Court's review of an administrative law judge's ("ALJ's") decision that plaintiff is neither disabled nor entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Pursuant to 28 U.S.C. § 636(c) and F.R.Civ.P. 73, the parties agreed to proceed before a United States Magistrate Judge, and by a March 7, 2006 order, this action was assigned to United States Magistrate Judge Lawrence J. O'Neill for all proceedings. Based on review of the Administrative Record ("AR") and the papers of plaintiff and defendant Jo Anne B. Barnhart, Commissioner of Social Security ("Commissioner"), this Court DENIES plaintiff's request to reverse the Commissioner's decision to deny plaintiff disability insurance benefits or to remand for further proceedings.

1

## BACKGROUND

### Personal Background

Plaintiff is age 40 and has a high school education and past relevant work performing multiple jobs at a cheese processing plant.  (AR 12, 47, 52, 291.)

### Administrative Proceedings

On December 2, 2003, plaintiff filed his Application for Disability Insurance Benefits to claim disability since August 23, 2003 due to hip and back pain.  (AR 12, 47.)  With its January 15, 2004 Notice of Disapproved Claims, the Social Security Administration ("SSA") denied plaintiff's claim and determined his condition is not severe enough to prevent him to work.  (AR 23.)  On March 2, 2004, counsel was appointed for plaintiff.  (AR 20.)  On March 4, 2004, plaintiff filed his Request for Reconsideration to claim that he is "disabled and unable to work."  (AR 28.)  With its April 15, 2004 Notice of Reconsideration, SSA again denied plaintiff's claim and determined that plaintiff's condition is not severe enough to prevent him to work.  (AR 29.)

On June 3, 2004, plaintiff filed his Request for Hearing by Administrative Law Judge to claim that he is "disabled and unable to work."  (AR 34.)  After a January 3, 2005 hearing, the ALJ issued his May 25, 2005 decision to conclude that plaintiff is able to perform limited sedentary work and is neither disabled nor entitled to disability insurance benefits.  (AR 18, 19.)  On July 25, 2005, plaintiff submitted to SSA's Appeals Council his Request for Review of Hearing Decision/Order.  (AR 7.)  On September 12, 2005, the Appeals Council denied plaintiff's request for review to render the ALJ's May 25, 2005 decision subject to this Court's review.  (AR 4.)

### Medical History And Records Review

#### Les A. Konkin, M.D., Treating Physician

In August 2002, plaintiff started to treat with Les A. Konkin, M.D. ("Dr. Konkin"), for pain and stiffness in plaintiff's hips.  (AR 104, 161, 210, 213.)  On January 8, 2003, plaintiff reported that "he is much better."  (AR 160, 179.)  Dr. Konkin concluded that "[a]t the present time, his symptoms, in my opinion, do not warrant any treatment."  (AR 160, 179.)  Dr. Konkin suggested that plaintiff "avoid high impact sports and heavy lifting," "focus his exercise activities on bicycling or swimming," and "monitor his weight carefully."  (AR 160, 179.)  On May 8, 2003, plaintiff reported right hip pain and crepitation

2

after "vigorous work activities." (AR 159, 178.) Dr. Konkin found plaintiff's gait pattern and range of motion unchanged and no significant change in hip appearance based on diagnostic studies. (AR 159, 178.) Dr. Konkin assessed plaintiff as stable, advised plaintiff of "all conservative modalities," and concluded that "radiologic findings and symptoms do not justify joint replacement." (AR 159, 178.)

Dr. Konkin conducted an October 10, 2003 evaluation of plaintiff's hip and spine and noted plaintiff's episodic right hip pain, chronic spine pain in the lower thoracic spine, and normal gait pattern. (AR 133, 158, 177.) Dr. Konkin diagnosed thoracic spondylosis and avascular necrosis of the hips with mild to moderate subjective symptomatology. (AR 133, 158, 177.) Dr. Konkin concluded that plaintiff "is permanently disabled from his usual and customary occupation" and "should consider vocational rehabilitation to a sedentary position." (AR 133, 158, 177.) According to Dr. Konkin, plaintiff's "subjective complaints do not warrant total joint replacement as of yet." (AR 133, 158, 177.) On December 11, 2003, plaintiff's primary complaint was pain over the posterior lateral aspect of each hip in distribution of the sciatic nerve while at rest. (AR 157, 176.) Dr. Konkin noted fair to good gait pattern, minimal discomfort with straight leg raising, and neither significant groin pain, pain with hip rotation nor focal neurological deficit in lower extremities. (AR 157.) Dr. Konkin diagnosed minimally symptomatic avascular necrosis of the hips and sciatica and advised an epidural lumbar injection. (AR 157.)

On January 29, 2004, Dr. Konkin noted plaintiff's unchanged subjective complaints and objective findings and epidural steroid injection on the next day. (AR 175.) On February 26, 2004, Dr. Konkin noted plaintiff's "significant relief" from the epidural steroid injection, "significantly improved" pain, normal gait pattern, and absence of pain with internal or external hip rotation. (AR 174.) Dr. Konkin's impression was "improving." (AR 174.) Dr. Konkin recommended a repeat corticosteroid injection. (AR 174.) On April 8, 2004, Dr. Konkin diagnosed avascular necrosis of the hips, minimally symptomatic. (AR 214.) Dr. Konkin noted that plaintiff's "subjective complaints do not warrant surgical intervention" although ultimately plaintiff may need hip replacements. (AR 214.) Dr. Konkin further noted plaintiff's "chronic back condition with a small lumbar disc protrusion" managed by epidural steroid injections. (AR 214.) Dr. Konkin restricted plaintiff from "manual labor activities, repetitive heavy lifting from floor to waist level of greater than 50 pounds, and high impact sports

activities," such as basketball, volleyball, baseball and football. (AR 214.) Dr. Konkin's April 22, 2004 notes reflect that plaintiff "seems depressed and in conflict with his wife." (AR 212.) Plaintiff complained of pain on the posterolateral aspect of the right hip in the region of the sciatic nerve and that he had been denied Social Security. (AR 212.) Dr. Konkin suggested a neurosurgical consultation and noted the plaintiff's "subjective complaints seem somewhat worse than his objective findings." (AR 212.) On June 3, 2004, Dr. Konkin found plaintiff's hips "remain severely symptomatic." (AR 226.) Dr. Konkin's examination revealed plaintiff's normal gait pattern. (AR 226.) Dr. Konkin diagnosed symptomatic avascular necrosis of hips and degenerative lumbar disc disease. (AR 226.) Dr. Konkin recommended a right hip core decompression. (AR 226.)

On June 22, 2004, Dr. Konkin performed a right hip core decompression without complication for plaintiff. (AR 242.) On July 28, 2004, five weeks after plaintiff's right hip core decompression, Dr. Konkin noted that plaintiff's "gait pattern is satisfactory partial weightbearing on the right leg." (AR 227, 274.) Dr. Konkin noted plaintiff's "[s]atisfactory course." (AR 227, 274.) On September 1, 2004, Dr. Konkin noted that plaintiff's degenerative lumbar disc disease had become "symptomatic." (AR 228.) Dr. Konkin found observed plaintiff's normal gait pattern, painless right hip range of motion, and absence of focal neurologic deficit in lower extremities. (AR 228.) Dr. Konkin diagnosed status post core decompression, right hip, degenerative lumbar disc disease, and avascular necrosis, left hip. (AR 228.) Dr. Konkin concluded that due to plaintiff's "multiple orthopedic conditions, he is permanently disabled." (AR 228.) On October 15, 2004, Dr. Konkin diagnosed bilateral mild avascular necrosis and noted plaintiff's normal gait pattern and normal passive range of motion in each hip. (AR 229.) Dr. Konkin continued plaintiff on anti-inflammatories and observed that plaintiff's pain complaints do not "justify total joint replacement at his young age." (AR 229.)

Dr. Konkin completed a November 23, 2004 Physical Residual Functional Capacity Questionnaire to note his diagnosis of avascular necrosis of the hips and ruptured lumbar disc and "fair" prognosis. (AR 266.) Dr. Konkin described plaintiff's hip and back pain as moderate increasing to severe. (AR 266.) Dr. Konkin checked off that depression affects plaintiff's physical condition. (AR 267.) Dr. Konkin noted that plaintiff's pain or other symptoms were severe enough to interfere with plaintiff's attention and concentration frequently to constantly. (AR 267.) According to Dr. Konkin,

1   plaintiff is able to tolerate low stress jobs.  (AR 267.)  Dr. Konkin estimated that plaintiff is able to: (1)

2   walk three blocks without rest or severe pain; (2) sit 30-35 minutes; (3) stand five minutes; (4) sit and

3   stand/walk less than two hours in an eight-hour workday; (5) rarely lift/carry up to 20 pounds; and (6)

4   rarely twist, stoop, crouch and climb.  (AR 267-269, 271.)  Dr. Konkin noted that plaintiff needs: (1) to

5   walk 10 minutes every hour during an eight-hour workday; (2) a job which permits shifting at will from

6   sitting, standing or walking; (3) eight unscheduled breaks during an eight-hour workday and one-hour

7   breaks; and (4) to elevate his legs six inches during 75 percent of a sedentary eight-hour workday.  (AR

8   269-271.)  Dr. Konkin found that plaintiff did not require a cane or other assistive device.  (AR 271.)

9   Dr. Konkin estimated that plaintiff would be absent from work more than four days per month.  (AR

10  271-272.)  Dr. Konkin commented that plaintiff's ability to work at a regular job on a sustained basis

11  would be affected by memory loss and cognitive impairment attention span.  (AR 272.)

12      Dr. Konkin's November 24, 2004 notes reflect the absence of "significant relief" from the core

13  decompression and continued pain in plaintiff's hips and back.  (AR 275.)  Dr. Konkin suggested that

14  plaintiff consult a joint replacement specialist.  (AR 275.)

### Paul Golden, M.D., Treating Internist

16      Plaintiff treated with internist Paul Golden, M.D. ("Dr. Golden").  On September 4, 2002,

17  plaintiff's wife called Dr. Golden's office to report that plaintiff's hips and knee gave out and that

18  plaintiff experienced "extreme" pain and dizziness. (AR 121.)  On September 18, 2002, plaintiff's wife

19  called Dr. Golden's office to request crutches because hip pain prevent plaintiff to put weight on his leg.

20  (AR 121.)  September 19, 2002 notes reflect plaintiff's increased right hip pain and onset of left hip pain.

21  (AR 120.)  Dr. Golden's October 23 and 24, 2002 notes reflect Dr. Golden's recommendation to return

22  plaintiff to work and plaintiff's reluctance.  (AR 118-119.)

### H. David Moehring, M.D., Consultative Orthopaedist – UC Davis Medical Center

24      Dr. Konkin referred plaintiff to H. David Moehring, M.D. ("Dr. Moehring"), Chief, General

25  Orthopaedics & Trauma, UC Davis Medical Center.  After a September 19, 2002 examination, Dr.

26  Moehring diagnosed early avascular necrosis of the hips and inflammatory arthritis.  (AR 100.)  Dr.

27  Moehring recommended that plaintiff consult with a rheumatologist to rule out inflammatory arthritis

28  and potential reevaluation to consider a core decompression.  (AR 100, 101.)

### *Donn Fassero, M.D., Consultative Orthopedist*

Plaintiff was referred to orthopedist Donn Fassero, M.D. ("Dr. Fassero"), for a September 26, 2002 orthopedic consultation. (AR 122.) Dr. Fassero diagnosed avascular necrosis of the femoral heads, right more symptomatic. (AR 123.) Dr. Fassero noted that plaintiff's "subjective symptoms seem to be much greater than the objective findings" and suggested "a diagnostic injection of a local anesthetic." (AR 123-124.)

### *Paul Schunke, M.D., Consultative Internist-Rheumatologist*

Dr. Golden referred plaintiff to internist-rheumatologist Paul Schunke, M.D. ("Dr. Schunke"), for a November 26, 2002 rheumatology evaluation. (AR 136.) Dr. Schunke diagnosed bilateral avascular necrosis of hips, probably idiopathic and no evidence of associated disease process. (AR 138.) Dr. Schunke concluded that "there seems to be no underlying condition associated with avascular necrosis of the hips." (AR 135.)

### *Oakdale Clinic*

During 2003 and 2004, plaintiff treated at Oakdale Clinic. On August 21, 2003, plaintiff complained of back pain which arose from twisting and turning after starting a new job which required lifting. (AR 143.) Plaintiff was assessed with back pain/muscle spasm. (AR 143.) August 27, 2003 notes reflect plaintiff's back and hip pain and that plaintiff denied depression. (AR 141.) September 11, 2003 notes reflect plaintiff's improved back pain, painful hips, benefits from Elavil and being off work, and recommendations of hot packs, TENS unit, recumbent bike and water exercise. (AR 140.) Plaintiff was assessed with probable depression. (AR 140.) September 12, 2003 notes reflect plaintiff's "back pain resolved" and hip pain better with no activity. (AR 139.) January 19, 2004 notes reflect that plaintiff had "stopped all his meds." (AR 230.)

### *Joseph K. Fluence, M.D., Treating Anesthesiologist*

On February 2, 2004, anesthesiologist Joseph K. Fluence, M.D. ("Dr. Fluence"), provided plaintiff a lumbar epidural steroid injection with no complications. (AR 191.) After plaintiff "did quite well" with the lumbar epidural steroid injection, Dr. Fluence, on March 11, 2004, administered a second, which plaintiff tolerated well. (AR 188.) On April 8, 2004, Dr. Fluence noted that plaintiff's decreased Vicodin "is a positive sign" of improvement and administered another lumbar epidural steroid injection

1   which plaintiff tolerated well.  (AR 186.)

2   ### *William L. Bargar, M.D., Consultative Orthopaedist*

3   _____On Dr. Konkin's referral (AR 276), orthopaedist William L. Bargar, M.D. ("Dr. Bargar"),

4   performed a January 13, 2005 orthopaedic consultation of plaintiff.  (AR 278.)  Plaintiff rated his right

5   hip pain as three on a 1-10 scale and noted that once a week he experiences sharp pain "with walking

6   or some activity" and reaching a 10 level and lasting a few minutes.  (AR 283.)  Plaintiff further

7   described groin pain that radiates to the anterior thigh above the knee.  (AR 283.)  Plaintiff noted that

8   he is able to walk six blocks, walks without a limp, and uses no ambulatory aid.  (AR 283.) Dr. Bargar's

9   examination revealed plaintiff's slight antalgic gait on the right when starting ambulation and subsequent

10  walking without a limp.  (AR 284.)  Dr. Bargar's examination further revealed "some pain in the right

11  hip with maximum flexion and maximum abduction."  (AR 284.)  Dr. Bargar diagnosed bilateral

12  avascular necrosis, stage I-A (ruleout collapse on right), chronic low back pain, thoracic arthritis and

13  anxiety disorder.  (AR 284.)  Dr. Bargar noted that I-A lesions of avascular necrosis "normally do not

14  require treatment" and recommended a CT scan of the femoral head to determine if there are stage III

15  lesions and a right side collapse.  (AR 284.)  Dr. Bargar concluded:

16          If it can be confirmed that these are I-A lesions, then I definitely do not recommend any
            treatment at the present time.  He may require a hip replacement in the future.  If, on the
17          other hand he is at stage III, then consideration could be given earlier to a hip
            replacement.
18
            It should be noted, however, that the patient does have chronic low back pain with
19          occasional sciatica on the right side and this may be contributing to his right hip
            symptoms.  (AR 285.)
20

21   ### *Non-Examining Physicians*

22          A California Disability Determination Services ("DDS") physician completed a January 12, 2004

23   Physical Residual Functional Capacity Assessment to conclude that plaintiff is able to: (1) lift/carry 20

24   pounds occasionally and 10 pounds frequently; (2) stand/walk at least two hours in an eight-hour

25   workday; (3) sit about six hours in an eight-hour workday; (4) occasionally climb, balance, stoop, kneel,

26   crouch and crawl; and (5) perform sedentary work.  (AR 164, 165, 169.)  DDS physician George A.

27   Jansen, Sr., M.D., affirmed the assessment on April 15, 2004.  (AR 170, 194.)

28   / / /

***Medical Imaging***

June 28, 2002 x-rays of plaintiff's pelvis and right hip were negative and revealed intact pelvic bones, symmetric and normal hip joints and unremarkable right hip. (AR 106.) July 20, 2002 magnetic resonance imaging ("MRI") of plaintiff's hips and pelvis revealed bilateral avascular necrosis of the femoral heads. (AR 107, 129.) September 19, 2002 x-rays of plaintiff's knees were negative and revealed normal joint spaces and neither fracture nor soft tissue swelling. (AR 98, 99.) September 19, 2002 x-rays of plaintiff's hips were negative and revealed neither fracture, soft tissue swelling nor degenerative changes within the joint space. (AR 96, 97.) September 19, 2002 x-rays of plaintiff's pelvis revealed plaintiff's normal sacroiliac joints, incidental density within the abdomen's left lower quadrant, and no evidence of osseous structure abnormalities. (AR 95.) An October 26, 2002 MRI of plaintiff's lumbar spine revealed a small central protrusion at L4-5 without spinal stenosis. (AR 128.)

January 8, 2003 x-rays of plaintiff's pelvis revealed vague radiolucency over the weight-bearing portion of the right femoral head that may be secondary to avascular necrosis but no definite left hip abnormality. (AR 182.) May 8, 2003 x-rays of plaintiff's pelvis revealed avacular necrosis of the femoral heads, stable on the right and slightly worse on the left. (AR 181.) October 10, 2003 x-rays of plaintiff's pelvis revealed a question of abnormality of the femoral heads. (AR 180.) August 29, 2003 x-rays of plaintiff's thoracic spine revealed fairly prominent degenerative changes with large osteophytes anteriorly at T8-9 and T9-10 and otherwise a normal thoracic spine. (AR 150.)

An April 29, 2004 MRI of plaintiff's lumbosacral spine revealed a small protrusion at L4-5 without canal or foraminal stenosis, a slight progression of disc desiccation at L5-S1, unchanged L5-S1 facet arthrosis, and absence of canal or foraminal stenosis. (AR 215.) An April 29, 2004 MRI of plaintiff's pelvis revealed avacular necrosis of plaintiff's hips, unchanged from prior examination, without signs of subchondral collapse. (AR 216.)

A February 10, 2005 CT scan of plaintiff's hips and pelvis revealed findings consistent with avascular necrosis without evidence of subchondral collapse of the left or right femoral head and status post right core decompression. (AR 287.)

***Medications***

Plaintiff's medications have included Altace 5 mg, Naproxen 500 mg, Proprxy 100 mg,

Hydrocodone 7.5 mg, Mobic 7.5 mg, Diazepam 5 mg, Amitriptyline 25 mg, Valium and Vicodin.  (AR 64, 71, 73, 88, 91.)

### Plaintiff's Activities And Testimony

#### Reports And Questionnaires

According to a February 26, 2004 Disability Report – Appeal, plaintiff's back inflammation improved since a lumbar epidural but plaintiff had "increased awareness of pain in hips and groin area." (AR 68.)  The report further noted plaintiff's dressing difficulty, everyday tasks requiring breaks and rests due to pain and fatigue, inability to walk long distances due to pain, lack of physical activity, depression and weight increase.  (AR 72.)

Plaintiff completed a March 18, 2004 Daily Activities Questionnaire to note that his daily activities include dog walking for 10 minutes in the morning and afternoon, newspaper reading, a morning and afternoon household chore or errand, e-mailing, picking up or preparing meals, and television watching.  (AR 84.) Plaintiff prepares easy meals, including spaghetti, steaks, stew and stir fry or gets take out food.  (AR 85.)  Plaintiff grocery shops every two or three days.  (AR 85.)  Plaintiff tries to perform two daily chores, including laundry, cleaning bathroom sinks and mirrors, dishwasher loading and vacuuming.  (AR 85.)  On some days, plaintiff performs no chores.  (AR 85.)  Plaintiff listens to music and watches television and remembers "these things fine." (AR 86.) Plaintiff's exercise is limited to walking.  (AR 86.)  Plaintiff experiences sleep difficulty.  (AR 84.) At times, plaintiff is irritable, argumentative and impatient.  (AR 87.)  Plaintiff walks and feeds his dog.  (AR 87.)  Plaintiff attends movies and sporting events.  (AR 87.)  Plaintiff experiences concentration and memory problems.  (AR 88.)  "Between sleep disorders and medication," plaintiff is "not mentally sharp" and his body is unable to "handle the daily rigors of a set work schedule."  (AR 88.)

Plaintiff's wife completed a March 18, 2004 Function Report Adult Third Party to note that plaintiff's daily activities include dog walking, newspaper reading, napping, attempts to complete one or two chores and to prepare dinner, and heating pad use.  (AR 75.)  Plaintiff becomes sore when he stands for 45-60 minutes.  (AR 75.)  Plaintiff experiences difficulty to sleep, putting on pants, and sitting.  (AR 76.)  Plaintiff tries to cook when he feels well enough and prepares meals at least two or three days per week.  (AR 77.)  Plaintiff performs light cleaning, laundry, lawn mowing and edging.

(AR 77.)  Plaintiff performs one or two chores in an 8-10 hour day and tries to perform chores daily. (AR 77.) Plaintiff's wife leaves plaintiff "a list of what to do each day." (AR 77.) Plaintiff does limited driving. (AR 78.) Plaintiff does light grocery shopping two or three times a week for less than one hour. (AR 78.) Plaintiff's hobbies and interests include television, movies and fishing. (AR 79.) Plaintiff visits his brother once a week. (AR 79.) Plaintiff does not lift, and his standing and sitting is limited. (AR 80.) Plaintiff is able to walk a block before needing to rest. (AR 80.) Plaintiff is able to pay attention for an hour. (AR 80.) Plaintiff is able to follow written and spoken instructions. (AR 80.) Plaintiff uses crutches and a cane. (AR 81.)

### Plaintiff's ALJ Hearing Testimony

Plaintiff testified at the January 3, 2005 ALJ hearing that he stopped working on August 23, 2003 because of pain from his shoulders to his knees. (AR 292.) Plaintiff has neither attempted nor applied for work since August 2003. (AR 292.)

Plaintiff's last job was a machine operator at a cheese processing plant. (AR 293.) Since 1989, plaintiff held other jobs at the plant, including working as a licensed pasteurizer and on the clean-up crew to perform machine maintenance and sanitation and operating various machines. (AR 294-297.)

Plaintiff experiences pain in both hips, lower back, and between his shoulder blades. (AR 299.) Occasionally, plaintiff's hip pain radiates down his right thigh to his knee. (AR 299.) Plaintiff's main complaint is in his lower back and right hip. (AR 315-316.) When asked if his pain is sharp, dull, burning, throbbing, shooting, stabbing, numbness, tingling or achy, plaintiff responded "[a]ll of the above." (AR 316.) Elevation alleviates plaintiff's pain. (AR 316.) On an average day, plaintiff's pain is mild to moderate and comes and goes "unexpectedly." (AR 316.) Plaintiff has been unable to quit his pain medication, which "don't help nearly as well as they used to." (AR 317.) On a bad pain day, plaintiff sits on a heating pad 4-5 hours, doubles his medication, and "just stay[s] in the house." (AR 320.) Plaintiff experiences a bad pain day once every two or three weeks. (AR 321.) Three days a week, plaintiff has good days when he is "relatively pain-free." (AR 321.)

Plaintiff selected August 23, 2003 as disability onset date because that "was the day that I realized that I was taking way too many drugs at work to safely perform my duties." (AR 301.) The medication clouded plaintiff's judgment. (AR 301.) Plaintiff was terminated from his job after a one-

1   year medical leave.  (AR 301.)

2       Plaintiff prepares meals seven days a week, washes dishes six days a week, does laundry every

3   other day, grocery shops twice a week, vacuums once a week, mops floors once a month, and

4   occasionally changes bedding.  (AR 303-304.)  Plaintiff spends three to fours hours daily watching

5   television and three to four hours weekly on the computer.  (AR 304.)  Plaintiff spends 2½ hours daily

6   reading and 30 minutes daily listening to the radio or stereo.  (AR 304-305.)  Plaintiff visits others once

7   a week.  (AR 305.)

8       Plaintiff's daily activities include walking his dog three times, getting the mail, showering,

9   dressing, watching television, preparing dinner, and performing household chores, including laundry,

10  dish washing, and vacuuming.  (AR 305, 306.)  Initially, plaintiff noted that he leaves the house four

11  times a day to "get some exercise," including dog walking and getting the mail.  (AR 306.)  Later,

12  plaintiff noted he takes at least two walks every day, "around 20 in a week." (AR 307.)  Plaintiff spreads

13  household chores over the week.  (AR 305.)  Plaintiff takes "a break every day, just because I have

14  nothing else to do.  I just have a pattern that whether I need it or not, that's just the pattern that I've

15  fallen into . . . ."  (AR 321.)  Plaintiff vacuums the swimming pool weekly and cleans the pool filters

16  every three months.  (AR 306.)  Plaintiff mows the lawn in spring and summer and does water therapy

17  in the pool in the summer.  (AR 306.)  Plaintiff has a drivers license and drives once a day three or four

18  times a week.  (AR 307.)

19      No doctor has placed physical restrictions on plaintiff, except Dr. Konkin who wants plaintiff

20  to reduce weight.  (AR 310.)  In the 12 months prior to the hearing, plaintiff had neither been to an

21  emergency room nor hospitalized over night.  (AR 310.)  Plaintiff sees no mental health professional.

22  (AR 310.)

23      Plaintiff estimates he is able to stand comfortably for 30 minutes although he claimed that if

24  necessary, he could stand for 10 hours.  (AR 312.)  Standing 15-20 minutes interferes with his

25  concentration.  (AR 320.)  Plaintiff is able to "sit all day" but is never comfortable.  (AR 313, 320.)

26  Plaintiff is able to walk two or three blocks but claims that he shuffles his feet to require him to walk

27  ten times slower than he had.  (AR 313, 322.)  Plaintiff is able to put on his shoes and socks "[w]ith

28  difficulty."  (AR 313.)  Plaintiff has no problems reaching, except once a month when his shoulder

1 arthritis "is acting up." (AR 313-314.) Plaintiff has no problem to hold or pick up items. (AR 314.)

2 Plaintiff has infrequent slurred speech from medication. (AR 314.) Plaintiff has no problem to turn his

3 head. (AR 315.) Plaintiff uses a telephone daily. (AR 315.) Plaintiff dresses and washes himself. (AR

4 319.)

5       Plaintiff sleeps as little as four or five hours a day and as much as 13 hours a day, depending on

6 how his drugs are working. (AR 309.) On most days, plaintiff does not require naps due to poor night

7 sleep. (AR 319.)

8       Plaintiff's exercise includes walking and pool exercises and stretches. (AR 317.) Plaintiff plays

9 video games weekly and attends a movie every two weeks. (AR 318.) During fishing season, plaintiff

10 fishes every six or eight weeks. (AR 318.)

11       Medication side effects include forgetfulness, nausea, sleeplessness, insomnia, and nightmares.

12 (AR 319.) As examples of forgetfulness, plaintiff identified inability to locate a once familiar park and

13 leaving items unattended. (AR 319-320.)

14       Plaintiff lives in a house with his wife and foster daughter, age 7. (AR 302.)

15                             ***Vocational Expert George Myers Testimony***

16       Vocation expert George Myers ("Mr. Myers") testified at the January 3, 2005 ALJ hearing that

17 plaintiff's work at the cheese processing plant included medium, unskilled, semiskilled and skilled, and

18 heavy, unskilled, semiskilled and skilled. (AR 323.) Mr. Myers noted there is no transferability of skills

19 from plaintiff's jobs. (AR 323-324.)

20       As a first hypothetical, the ALJ asked Mr. Myers to assume a region defined as the state of

21 California, a light residual functional capacity and a person who: (1) is age 38; (2) has a high school

22 education and plaintiff's work history as described; (3) is able to lift, push and pull 20 pounds

23 occasionally and 10 pounds frequently; (4) is able to walk/stand frequently; and (5) is able to sit, stoop

24 or bend occasionally. (AR 324.) Mr. Myers testified that such person would be unable to perform

25 plaintiff's past relevant work but could perform jobs as a cashier (92,000), counter clerk (11,000) and

26 assembler (51,000). (AR 324.)

27       As a second hypothetical, the ALJ asked Mr. Myers to assume a region defined as the state of

28 California, a light residual functional capacity and a person who: (1) is unlimited in attention,

concentration, understanding and memory; (2) has diminished but corrected vision; (3) has unlimited hearing; (4) intact and unlimited reach and fine, gross manipulative abilities; (5) is slightly limited in ability to do simple repetitive tasks; (6) has no environmental restrictions; (7) has unlimited public contact; (8) requires occasional supervision; and (9) has slight to moderate pain. (AR 324.) Mr. Myers assigned a five percent erosion to cashier and counter clerk jobs and a 15 percent erosion to assembler jobs. (AR 324.) After modification to the second hypothetical of slight limitation in understanding and memory, Mr. Myers identified no additional erosion in the jobs. (AR 325.) After modification to the second hypothetical of moderate to severe pain, Mr. Myers assigned a 20 percent erosion to the cashier and counter clerk jobs and a 40 percent erosion to the assembler jobs. After modification to the second hypothetical of a sit/stand option and moderate limitation in ability to perform simple repetitive tasks, Mr. Myers assigned a 90 percent erosion to the cashier and counter clerk jobs and a 99 percent erosion to the assembler jobs. (AR 325.)

As a third hypothetical, the ALJ asked Mr. Myers to assume a region defined as the state of California, a sedentary residual functional capacity and a person who: (1) is age 38 unlimited; (2) has a high school education and plaintiff's work history as described; (3) is able to lift, push and pull 10 pounds occasionally and five pounds frequently; (4) is able to walk, stand, stoop and bend occasionally; and (5) is able to sit frequently. (AR 325.) Mr. Myers testified that such person would be unable to perform plaintiff's past relevant work but could perform jobs as an assembler (10,000), information clerk (4,000) and produce inspector (4,000). (AR 324.)

As a fourth hypothetical, the ALJ asked Mr. Myers to assume a person who has: (1) unlimited attention, concentration, understanding and memory; (2) diminished but correctable vision; (3) intact and unlimited hearing, reaching, fine and gross manipulation abilities; (4) slightly limited ability to perform simple, repetitive tasks; (5) no environmental restrictions; (6) unlimited public contact; (7) occasional supervision; and (8) slight to moderate pain. (AR 326.) Mr. Myers assigned a 15 percent erosion to the assembler and produce inspector jobs and a 10 percent erosion to the information clerk jobs. (AR 326.) After a modification of the fourth hypothetical of slightly limited understanding and memory, Mr. Myers assigned no additional erosion to the assembler, produce inspector and information clerk jobs. (AR 326.) After a modification of the fourth hypothetical of moderate to severe pain, Mr.

Myers assigned a 40 percent erosion to the assembler and produce inspector jobs and a 25 percent erosion to the information clerk jobs.  (AR 326.)  After a modification to the fourth hypothetical of a sit/stand option and moderate limitation to perform simple repetitive tasks, Mr. Myers assigned a 100 percent erosion to the assembler and produce inspector jobs and 95 percent erosion to the information clerk jobs.  (AR 326.)

As a first hypothetical, plaintiff's counsel asked Mr. Myers to assume a light residual functional capacity and a person requiring a nap a couple of times a day due to sleep difficulties.  (AR 327.)  Mr. Myers testified there would be no jobs in the national economy.  (AR 327.)  After an ALJ modification to counsel's first hypothetical of two unscheduled 30-45 minute naps, Mr. Myers assigned a 75 percent erosion to light, unskilled jobs.  (AR 328.)

As a second hypothetical, plaintiff's counsel asked Mr. Myers to assume light residual functional capacity and person who is unable to go to work one day a week due to pain and/or fatigue.  (AR 327.) Mr. Myers testified there would be no jobs in the national economy.  (AR 327.)

As a third hypothetical, plaintiff's counsel asked Mr. Myers to assume a light residual functional capacity and a person with moderate concentration deficit.  (AR 328.)  Mr. Myers testified there would be a 15 percent erosion of applicable jobs.  (AR 328.)

As a fourth hypothetical, plaintiff's counsel asked Mr. Myers to assume a sedentary residual functional capacity and a person with moderate to severe concentration loss.  (AR 328.)  Mr. Myers testified there would be a 15 percent erosion of applicable jobs.  (AR 328.)

### The ALJ's Findings

With his May 25, 2005 decision, the ALJ identified the primary issue as whether plaintiff is under a disability.  In concluding the plaintiff is not disabled and thus not entitled to disability insurance benefits, the ALJ found:

1.  Plaintiff's avascular necrosis of the femoral heads (hip joints) and degenerative changes in the lumbar and thoracic spine are "severe" but do not meet or medically equal an impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments").

2.  Plaintiff's allegations regarding his limitations are not totally credible.

14

3.  Plaintiff has the residual functional capacity to frequently lift up to five pounds and occasionally lift up to 10 pounds and sit for six hours and stand or walk for two hours in an eight-hour workday.  Plaintiff is able only occasionally to stoop, crouch, kneel, squat and crawl.  Plaintiff has slight limitations in understanding and memory but unlimited ability to maintain concentration, persistence or pace.

4.  Plaintiff is unable to perform any of his past relevant work.

5.  Plaintiff has the residual functional capacity to perform a significant range of sedentary work.

6.  Although plaintiff's exertional limitations preclude him to perform the full range of sedentary work and using section 201.28 of the Medical-Vocational Guidelines, 20 C.F.R., Part 404, Subpart P, Appendix 2, there are a significant number of jobs in the national economy that plaintiff could perform and including in California assembly work (8,500 jobs), information clerk (3,600 jobs) and produce inspector (3,400 jobs). (AR 18.)

## DISCUSSION

### Standard Of Review

Congress has provided limited judicial review of a Commissioner's decision made through an ALJ.  *See* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .).  A court must uphold the Commissioner's decision, made through an ALJ, when the determination is not based on legal error and is supported by substantial evidence.  *See Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services*, 812 F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant could perform light work contrary to treating physician's findings).[1]  Substantial evidence is "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420 (1971), but less than a preponderance,  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  Substantial evidence "means such evidence as a reasonable mind might accept as adequate to support a conclusion."

---

[1]     "The district court properly affirms the Commissioner's decision denying benefits if it is supported by substantial evidence and based on the application of correct legal standards." *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997).

15

1    *Richardson*, 402 U.S. at 401, 91 S.Ct. 1420; *Sandgathe*, 108 F.3d at 980.

2    The record as a whole must be considered, weighing both the evidence that supports and detracts

3    from the Commissioner's conclusion.  *Sandgathe*, 108 F.3d at 980; *Jones,* 760 F.2d at 995.  If there is

4    substantial evidence to support the administrative finding, or if there is conflicting evidence that will

5    support a finding of either disability or nondisability, the finding of the Commissioner is conclusive.

6    *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9ᵗʰ Cir. 1987).  If the evidence is susceptible to more than

7    one rational interpretation, the court may not substitute its judgment for that of the Commissioner.

8    *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9ᵗʰ Cir. 1999); *Morgan v. Commissioner*, 169 F.3d 595, 599 (9ᵗʰ

9    Cir. 1999).

10   This Court reviews the ALJ's decision pursuant to 42 U.S.C. § 405(g) to determine whether it

11   is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

12   whole.  *Copeland v. Bowen*, 861 F.2d 536, 538 (9ᵗʰ Cir. 1988).  "A decision of the ALJ will not be

13   reversed for errors that are harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9ᵗʰ Cir. 2005).

14   Plaintiff bears the burden to prove that he is disabled which requires presentation of "complete

15   and detailed objective medical reports of his condition from licensed medical professionals."  *Meanel*

16   *v. Apfel*, 172 F.3d 1111, 1113 (9ᵗʰ Cir. 1999) (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)).

17   "Failure to prove disability justifies a denial of benefits."  *Ukolov v. Barnhart*, 420 F.3d 1002, 1004 (9ᵗʰ

18   Cir. 2005); *see Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir.1995), *cert. denied*, 517 U.S. 1122, 116

19   S.Ct. 1356 (1996).  Plaintiff must furnish medical and other evidence about plaintiff's medical

20   impairments. 20 C.F.R. §§ 404.1512(a), 416.912(a); ("[Y]ou must bring to our attention everything that

21   shows that you are blind or disabled."); 20 C.F.R. §§ 404.1514, 416.914 ("We need specific medical

22   evidence to determine whether you are disabled or blind.  You are responsible for providing that

23   evidence.")

24   Here, plaintiff claims disability since August 23, 2003 due to hip and back pain.  (AR 12, 47.)

25   With the above standards in mind, this Court turns to plaintiff's criticism of the ALJ's May 25,

26   2005 decision.

27   **Dr. Konkin's Opinion**

28   Plaintiff challenges the ALJ's evaluation of Dr. Konkin's assessment and focuses on Dr.

1    Konkin's responses to the November 23, 2004 Physical Residual Functional Capacity Questionnaire

2    provided by plaintiff's counsel.  The Commissioner responds that the ALJ properly rejected Dr.

3    Konkin's responses in the questionnaire.

4          A treating physician's opinion is not conclusive as to a claimant's physical condition or the

5    ultimate issue of disability and may be disregarded by the ALJ even when it is not contradicted. *Matney*

6    *v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992); *Rodriquez v. Bowen*, 876 F.2d 759, 761-762, n. 7 (9th

7    Cir. 1989); *Magallanes*, 881 F.2d at 751.[2]  An ALJ may reject a treating physician's opinion whether

8    or not it is contradicted, if the opinion is "brief and conclusory in form with little in the way of clinical

9    findings to support its conclusion."  *Magallanes,* 881 F.2d at 751.  Inconsistencies and ambiguities in

10   a treating physician's opinion regarding disability may constitute specific, legitimate reasons to reject

11   the opinion.  *Matney*, 981 F.2d at 1020.

12         The Ninth Circuit has further explained:

13              To reject the opinion of a treating physician which conflicts with that of an
                examining physician, the ALJ must "'make findings setting forth specific, legitimate
14              reasons for doing so that are based on substantial evidence in the record.'" . . . "The ALJ
                can meet this burden by setting out a detailed and thorough summary of the facts and
15              conflicting clinical evidence, stating his interpretation thereof, and making findings." .
                . . The rule . . . does not apply, however, "when the nontreating physician relies on
16              independent clinical findings that differ from the findings of the treating physician." . .
                . "'[T]o the extent that [the nontreating physician's] opinion rests on objective clinical
17              tests, it must be viewed as substantial evidence . . .'"

18   *Magallanes*, 881 F.2d at 751(citations omitted.)

19         An ALJ may reject a treating physician's report based on a claimant's exaggerated claims.  *See,*

20   *e.g., Sandgathe*, 108 F.3d at 980.  A physician's opinion of disability "premised to a large extent upon

21   claimant's own accounts of his symptoms and limitations" may be disregarded where those complaints

22   have been "properly discounted."  *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citing *Brawner v.*

23   *Sec. of Health & Human Servs.*, 839 F.2d 432, 433-434 (9th Cir. 1988)); *see Saelee v. Chater*, 94 F.3d

24   520, 522 (9th Cir. 1996), *cert. denied*, 519 U.S. 1113, 117 S.Ct. 953 (1997) ("no physician has been able

25   to find a link between [claimant's] complaints and known medical pathologies").

26   _____

27        [2]       A treating physician's opinion is not conclusive as to a claimant's disability as this ultimate issue is an
     administrative finding reserved to the Commissioner. 20 C.F.R. § 404.1527(e).  The Commissioner has final responsibility
28   to determine a claimant's residual functional capacity.  20 C.F.R. § 404.1546.

1    "[T]he ALJ is responsible for determining credibility, resolving conflicts in the medical

2    testimony, and for resolving ambiguities." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

3    Inconsistencies and ambiguities in a treating physician's opinion regarding disability may constitute

4    specific, legitimate reasons to reject the opinion. *Matney*, 981 F.2d at 1020.

5    As a reminder, on September 1, 2004, Dr. Konkin concluded that due to plaintiff's "multiple

6    orthopedic conditions, he is permanently disabled." (AR 228.)  In his responses to the November 23,

7    2004 Physical Residual Functional Capacity Questionnaire, Dr. Konkin noted that plaintiff's pain or

8    other symptoms were severe enough to interfere with plaintiff's attention and concentration frequently

9    to constantly. (AR 267.) Dr. Konkin estimated that plaintiff is able to: (1) walk three blocks without rest

10   or severe pain; (2) sit 30-35 minutes; (3) stand five minutes; (4) sit and stand/walk less than two hours

11   in and eight-hour workday; (5) rarely lift/carry up to 20 pounds; and (6) rarely twist, stoop, crouch, and

12   climb.  (AR 267-269, 271.)  Dr. Konkin noted that plaintiff needs: (1) to walk 10 minutes every hour

13   during an eight-hour workday; (2) a job which permits shifting at will from sitting, standing or walking;

14   (3) eight unscheduled breaks during an eight-hour workday and one-hour breaks; and (4) to elevate his

15   legs six inches during 75 percent of a sedentary eight-hour workday.  (AR 269-271.)  Dr. Konkin

16   estimated that plaintiff would be absent from work more than four days per month.  (AR 271-272.)

17   Plaintiff contends that based on Dr. Konkin's residual functional capacity assessment, plaintiff "could

18   not even perform sedentary work."

19   After detailing the medical evidence, including Dr. Konkin's records (AR 13-15), the ALJ

20   thoroughly explained his partial acceptance of Dr. Konkin's evaluation:

21   > In evaluating the medical evidence, very substantial weight is given to Dr. Konkin's
   > treatment records as a whole.  These demonstrate by objective evidence that the claimant
22   > has impairments of his hips and back which could reasonably limit him to primarily
   > sedentary exertion.  The opinions of the state agency analyst and reviewing medical
23   > consultant are in agreement that the claimant is able to perform sedentary work, with
   > postural limitations (Exhibits 5F; 8F).  Substantial weight is also given to Dr. Konkin's
24   > statement in October 2004 that the claimant could not perform his past work and should
   > retrain for a sedentary job, since this opinion took into account not only the claimant's
25   > hip impairments but also the presence of degenerative changes in his lumbar and thoracic
   > spine (Exhibit 3F, p. 4).  However, little weight is given to the November 2004
26   > assessment, which limited the claimant to essentially part-time sedentary exertion, with
   > additional restrictions on sitting and standing, and with pain-related impairment of
27   > concentration (Exhibit 13F, pp. 2-8).  This assessment is not supported by Dr. Konkin's
   > own treating records before and after the date it was completed, or by examination
28   > findings; it appears to be an accommodation for the claimant and to be completed to his

18

1
2
3
4
5

specifications.  Although moderate to severe limitations in concentration and attention were imposed, the claimant's demeanor and bearing at his medical examinations did not support . . . these limitations.  For instance, at the January 2005 examination the claimant was able to give a detailed chronological history of the onset and progress of his orthopedic problems, and did not appear to have difficulties with attention (Exhibit 14F, pp. 2-3).  However, in light of the claimant's documented pain symptoms and daily use of narcotic medication, it is reasonable to find that he has slight limitation in understanding and memory. (AR 16.)

6   As the Commissioner correctly notes, the ALJ properly rejected Dr. Konkin's November 23,

7   2004 Physical Residual Functional Capacity Questionnaire assessment because it was unsupported by

8   his treating records and examination.  As of August 22, 2002, Dr. Konkin noted plaintiff's normal pelvis

9   x-ray revealing intact pelvis bones, normal and symmetric hip joints, and unremarkable right hip.  (AR

10   105, 106.)  On January 8, 2003, Dr. Konkin concluded that plaintiff's symptoms "do not warrant

11   treatment" and recommended that plaintiff focus on bicycling and swimming.  (AR 160, 179.)  On May

12   8, 2003, Dr. Konkin focused on "conservative modalities" in absence of justification for more aggressive

13   treatment based on "radiologic findings and symptoms."  (AR 178.)  On October 10, 2003, Dr. Konkin

14   noted mild to moderate symptomatology.  (AR 133, 158, 177.)  On December 11, 2003, Dr. Konkin

15   noted plaintiff's minimal discomfort with straight leg raising and absence of pain with hip rotation and

16   that plaintiff was minimally symptomatic.  (AR 157.)  On February 26, 2004, Dr. Konkin noted

17   plaintiff's "significant relief" from an epidural steroid injection and "significantly improved" pain.  (AR

18   174.)  On April 8, 2004, Dr. Konkin noted that plaintiff was minimally symptomatic and restricted

19   plaintiff from "manual labor activities, repetitive heavy lifting from floor to waist level of greater than

20   50 pounds, and high impact sports activities," such as basketball, volleyball, baseball and football.  (AR

21   214.) On April 22, 2004, Dr. Konkin noted that plaintiff's "subjective complaints seem somewhat worse

22   than his objective findings."  (AR 212.)  On October 10, 2004, Dr. Konkin recommended "vocational

23   rehabilitation to a sedentary position."  Dr. Konkin consistently noted plaintiff's normal gait and pattern

24   hip range of motion.  (AR 133, 157-159, 174, 177, 178, 226, 229.)

25   The inconsistencies of the medical record, including those noted by the ALJ, provide sufficient

26   grounds to reject Dr. Konkin's far reaching limitations noted in his responses to the November 23, 2004

27   Physical Residual Functional Capacity Questionnaire. *See Weetman v. Sullivan*, 877 F.2d 20, 23 (9th Cir.

28   1989) (rejection of treating physician opinion inconsistent with contemporaneous medical notes).

19

1    In addition, the ALJ questioned whether Dr. Konkin completed the November 23, 2004 Physical

2    Residual Functional Capacity Questionnaire in that handwriting varied on the form.  (AR 15.)  As to the

3    handwriting discrepancy, plaintiff explains that Dr. Konkin and his physician's assistant completed the

4    form together.   Based on the ALJ's proper rejection of the questionnaire as outlined above, the

5    handwriting discrepancy is a non-issue.  Plaintiff demonstrates no error in the ALJ's evaluation of Dr.

6    Konkin's assessment.

7                                              **Plaintiff's Credibility**

8    Plaintiff argues that "the ALJ failed to provide the requisite 'clear and convincing' reasons for

9    rejecting [plaintiff's] testimony regarding his subjective complaints of pain and limitations."   The

10   Commissioner responds that the "ALJ's credibility determination was sufficiently specific to permit the

11   court to conclude that the ALJ did not arbitrarily discredit [plaintiff's] testimony."

12   "Credibility determinations are the province of the ALJ." *Fair v. Bowen*, 885 F.2d 597, 604 (9th

13   Cir. 1989); *Russell v. Bowen*, 856 F.2d 81, 83 (9th Cir. 1988).  "An ALJ cannot be required to believe

14   every allegation of disabling pain."  *Fair*, 885 F.2d at 603. An ALJ "may disregard unsupported, self-

15   serving statements."  *Flaten v. Secretary of Health & Human Services*, 44 F.3d 1453, 1464 (9th Cir.

16   1995).

17   A claimant bears an initial burden to "produce objective medical evidence of underlying

18   'impairment,' and must show that the impairment, or a combination of impairments, 'could reasonably

19   be expected to produce pain or other symptoms.'" *Baston v. Commissioner of Social Security*, 359 F.3d

20   1190, 1196 (9th Cir. 2004) (quoting *Smolen*, 80 F.3d at 1281)).  If a claimant satisfies such initial burden

21   and "if the ALJ's credibility analysis of the claimant's testimony shows no malingering, then the ALJ

22   may reject the claimant's testimony about severity of symptoms with 'specific findings stating clear and

23   convincing reasons for doing so.'" *Baston*, 359 F.3d at 1196 (quoting *Smolen*, 80 F.3d at 1284).  "If the

24   ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the

25   ALJ must make a credibility determination with findings sufficiently specific to permit the court to

26   conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d

27   947, 958 (9th Cir. 2002).

28   If an ALJ's credibility finding is supported by substantial evidence in the record, a reviewing

1   court may not engage in second-guessing. *Thomas*, 278 F.3d at 959.  A reviewing court will not reverse

2   an ALJ's credibility determinations "based on contradictory or ambiguous evidence." *Johnson*, 60 F.3d

3   at 1434 (citing *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)).  "So long as the adjudicator makes

4   specific findings that are supported by the record, the adjudicator may discredit the claimant's allegations

5   based on inconsistencies in the testimony or on relevant character evidence." *Bunnell v. Sullivan*, 947

6   F.2d 341, 346 (9th Cir. 1991).  Moreover, "the ALJ is entitled to draw inferences 'logically flowing from

7   the evidence.'" *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996) (quoting *Sample v. Schweiker*, 694

8   F.2d 639, 642 (9th Cir. 1982)).

9           In *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), the Ninth Circuit commented:

10          In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness,
            inconsistencies either in his testimony or between his testimony and his conduct, his
11          daily activities, his work record, and testimony from physicians and third parties
            concerning the nature, severity, and effect of the symptoms of which he complains.
12          *Smolen*, 80 F.3d at 1284; *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (quoting
            *Orteza v. Shalala*, 50 F.3d 748, 749-50 (9th Cir. 1995)); 20 C.F.R. § 404.1529(c).  An
13          ALJ's finding that a claimant generally lacked credibility is permissible basis to reject
            excess pain testimony.

14

15   *See also* SSR 96-7p.[3]

16          An ALJ may consider the following factors to determine the credibility of a claimant's

17   allegations of disabling pain:

18          1.      The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

19          2.      Precipitating and aggravating factors (e.g., movement, activity, environmental

20                  conditions);

21          3.      Type, dosage, effectiveness, and adverse side-effects of pain medication;

22          4.      Treatment, other than medication, for pain relief;

23          5.      Functional restrictions;

24   _____

25          [3]      SSR 96-7p sets out factors to assess a claimant's credibility: (1)  claimant's daily activities; (2) location,
     duration, frequency, and intensity of claimant's pain or other symptoms; (3) factors that precipitate and aggravate the
26   symptoms; (4) type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate pain
     or other symptoms; (5) treatment, other than medication, claimant receives or has received for relief of pain or other
27   symptoms; (6) measures other than treatment claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on
     his or her back, standing 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the
28   claimant's functional limitations and restrictions due to pain or other symptoms.

6.    Claimant's daily activities;

7.    Unexplained, or inadequately explained, failure to seek treatment or to follow up a prescribed course of treatment; and

8.    Ordinary techniques to test a claimant's credibility.

*Bunnell*, 947 F.2d at 346; *see* 20 C.F.R. §§ 404.1529, 416.929.

After reviewing the evidence (AR 13-15), the ALJ explained that plaintiff's subjective complaints "are not supported by the medical evidence and are not entirely credible":

> The claimant testified that he last worked in August 2003.  He testified that he has pain in his shoulders, knee, back and hips; that he takes medication three times a day and that it does help sometimes.  The claimant stated that he lives with his wife and child; that he received state disability but now his wife supports the family.  He testified that he is able to dress and bathe himself, drive a car 3-4 times a week, and works on the computer 3-4 hours daily.  The claimant stated that he does household chores such as cooking seven times a day, does dishes six times a day, laundry 3-4 times a week, sweeping, mopping, and vacuuming once a week; that he does maintenance on the family swimming pool, and shops for groceries twice a week.  He testified that he is able to stand for 30 minutes at a time, walk 2-3 blocks, and sit all day.  He stated that he did not have problems sleeping.

> Weighing all relevant factors, the Administrative Law Judge finds that the claimant's impairments are not as limiting as alleged.  The claimant has testified to severe limitations on his ability to walk and stand, but also to a range of daily activities which contradict these limitations, since housework and shopping usually require walking and standing more than 30 minutes at a time.  Further, the claimant's daily sustained use of the computer indicates that he does not have difficulty in concentrating or following fairly complex procedures.  The claimant's excellent work record weighs favorably in evaluating his credibility; however, both an examining physician in September 2002, and a treating physician in April 2004, stated that the claimant's subjective complaints were not supported by the objective findings (Exhibits 2F, p. 9; 10F, p. 4).  This suggests that the claimant may be magnifying his symptoms and limitations.  Further, the claimant sometimes appeared evasive in his responses at the hearing.  (AR 16-17.)

The ALJ properly discounted plaintiff's alleged limitations in that they were not commensurate to plaintiff's conservative treatment.  Treating physician Dr. Konkin found plaintiff's "subjective complaints seem somewhat worse than his objective findings." (AR 212.) Consultative orthopedist Dr. Fassero echoed such sentiment and noted that plaintiff's "subjective symptoms seem to be much greater than the objective findings."  (AR 123-124.)  Consultative internist-rheumatologist Dr. Schunke concluded that "there seems to be no underlying condition associated with avascular necrosis of the hips." (AR 135.) Consultative orthopaedist Dr. Bargar's January 13, 2005 examination revealed "some pain in the right hip with maximum flexion and maximum abduction."  (AR 284.)  Dr. Bargar

1    considered discontinuing plaintiff's treatment.  (AR 285.)

2            Medical imaging fails to support plaintiff's alleged limitations.  (AR 95-99,106, 128, 215.)

3    Plaintiff's pain was generally managed with medication and injections. (AR 174, 186, 214.) *See Meanel*

4    *v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (ALJ properly considered treating physician's failure to

5    prescribe and claimant's failure to request "any serious medical treatment for this supposedly

6    excruciating pain"); *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) ("conservative treatment"

7    suggests "a lower level of both pain and functional limitation"); *Bunnell*, 947 F.2d at 346 ("unexplained,

8    or inadequately explained, failure to seek treatment or follow a prescribed course of treatment" is

9    relevant to assess credibility);  *see also Flaten v. Secretary of Health & Human Servs.*, 44 F.3d 1453,

10   1464 (9th Cir. 1995) (ALJ entitled to draw inference from general lack of care).  Plaintiff was advised

11   to focus on low impact aerobic exercise.  (AR 140, 160, 179.) Plaintiff required neither a cane nor

12   assistive device. (AR 271.) Furthermore, plaintiff was not an imminent hip replacement candidate. (AR

13   133, 158, 177, 229, 285.)

14           Despite making misstatements as to plaintiff's testimony, the ALJ properly discredited plaintiff's

15   alleged limitations as inconsistent with his daily activities.  An ALJ may rely on evidence of a claimant's

16   daily activities to discount pain allegations.  "[I]f, despite his claims of pain, a claimant is able to

17   perform household chores and other activities that involve many of the same physical tasks as a

18   particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does

19   not prevent the claimant from working." *Fair*, 885 F.2d at 603.  Plaintiff noted that his daily activities

20   include:

21           1.       Walking his dog at least twice daily and feeding the dog (AR 84, 87, 305- 307);

22           2.       Newspaper reading (AR 84);

23           3.       A morning and afternoon errand or chore (AR 84);

24           4.       E-mailing (AR 84);

25           5.       Preparing or picking up meals (seven days a week) (AR 84, 85, 305, 306);[4]

26           6.       Television watching (AR 84, 305, 306); and

27   _____

28           [4]        The ALJ misstated that plaintiff cooks seven times a day.  (AR 16.)

                                                    23

1    7.    Household chores, including laundry (every other day), cleaning, dishwasher loading (six

2    days a week),[5] vacuuming (once weekly), mopping (once monthly), and bed changing

3    (occasionally) (AR 303-305).

4    Plaintiff's other activities include grocery shopping (every two or three days); computer use (up to four

5    hours a week),[6] attending movies and sporting events, playing video games, fishing, vacuuming the

6    swimming pool, cleaning swimming pool filters, lawn mowing and driving three or four times a week.

7    (AR 85, 87, 306-307, 318.)

8    Other evidence undermined plaintiff's credibility.  As of January 13, 2005, plaintiff generally

9    rated his right hip pain as a three on a 1-10 scale and described it as mild to moderate.  (AR 283, 316.)

10   Plaintiff acknowledged he has "relatively pain-free" days.  (AR 321.)  Dr. Bargar recorded that plaintiff

11   is able to walk six blocks although plaintiff testified he is able to walk only two or three blocks.  (AR

12   283, 313, 322.)  Despite the medical record consistently noting plaintiff's normal gait, plaintiff claimed

13   that he shuffles his feet to require him to walk 10 times slower than he had.  (AR 133, 157-159, 174,

14   177, 226, 228, 229, 313, 322.)  Plaintiff acknowledged that he remembered television programs "fine."

15   (AR 86.)  Plaintiff continued to work despite his alleged limitations.  (AR 292.)

16   Specific, clear and convincing reasons support the ALJ's finding that plaintiff's allegations as

17   to his limitations are not credible.  (AR 20.)  *See Verduzco v. Apfel*, 188 F.3d 1087, 1090 (9th Cir. 1999)

18   ("The ALJ pointed out several areas in which the appellant's testimony or behavior was inconsistent

19   with his own statements or actions, as well as with the medical evidence.")  Plaintiff overstated his

20   alleged limitations.  Based on the substantial evidence to support the ALJ's credibility determination,

21   this Court does not second guess the ALJ.

22                           **Credibility Of Plaintiff's Wife**

23   Plaintiff faults the ALJ for failing to address comments of plaintiff's wife in her March 18, 2004

24   Function Report Adult Third Party as to changes in plaintiff and his alleged limitations.   The

25   Commissioner responds that the "medical assessment" of plaintiff's wife "was beyond the lay witness'

26   _____

27   [5]    The ALJ misstated that plaintiff does dishes six times a day.  (AR 16.)

28   [6]    The ALJ misstated that plaintiff works three to four hours daily on the computer.  However, plaintiff's
     March 18, 2004 Daily Activities Questionnaire notes e-mailing as a daily activity.  (AR 84.)

1  competence and therefore did not constitute reliable evidence."

2       As a reminder, in her report, plaintiff's wife commented, among other things, that: (1) plaintiff's

3  daily activities include dog walking, newspaper reading, napping, attempts to complete one or two

4  chores and to prepare dinner, and heating pad use (AR 75); (2) plaintiff becomes sore when he stands

5  for 45-60 minutes (AR 75); (3) plaintiff tries to cook when he feels well enough and prepares meals at

6  least two or three days per week (AR 77); (4) plaintiff performs light cleaning, laundry, lawn mowing

7  and edging (AR 77); (5) plaintiff performs one or two chores in an 8-10 hour day and tries to perform

8  chores daily (AR 77); (6) plaintiff does light grocery shopping two or three times a week for less than

9  one hour (AR 78); (7) plaintiff's hobbies and interests include television, movies and fishing (AR 79);

10 (8) plaintiff's standing and sitting is limited (AR 80); (9) plaintiff is able to walk a block before needing

11 to rest (AR 80); and (10) plaintiff uses crutches and a cane. (AR 81.)

12      The Commissioner correctly notes that the comments of plaintiff's wife fail to dispute the ALJ's

13 findings regarding plaintiff's daily activities. Plaintiff fails to demonstrate meaningful error or harm

14 from the ALJ's failure to address the self-serving comments of plaintiff's wife.

15                              **Alleged Mental Impairment**

16      Plaintiff contends that the ALJ erred by "ignoring substantial evidence" of plaintiff's "mental

17 impairment." The Commissioner responds that the ALJ supported with substantial evidence his finding

18 that plaintiff "has slight limitations in understanding and memory." (AR 16, 18.)

19      The SSA regulations provide: "If you do not have any impairment or combination of impairments

20 which significantly limits your physical or mental ability to do basic work activities, we will find that

21 you do not have a severe impairment and are, therefore, not disabled." 20 C.F.R. §§ 404.1520(c),

22 416.920(c). "Basic work activities" are the "abilities and aptitudes necessary to do most jobs," including

23 "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling" as well as

24 "[u]nderstanding, carrying out, and remembering simple instructions." 20 C.F.R. §§ 404.1521(b)(1),

25 (3), 416.921(b)(1), (3). At step two of the five-step disability evaluation, "the ALJ must consider the

26 combined effect of all of the claimant's impairments on her ability to function, and without regard to

27 whether each alone was sufficiently severe." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).

28 Such inquiry "is a de minimis screening device to dispose of groundless claims." *Smolen*, 80 F.3d at

1290 (citing *Bowen v. Yuckert*, 482 U.S. 137, 153-154, 107 S.Ct. 2287, 2297-2298 (1987)).

The purpose of the Listing of Impairments is to describe impairments "severe enough to prevent a person from doing any gainful activity." *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885 (quoting Social Security Ruling ("SSR") 83-19, Dept. of Health and Human Services Rulings 90 (Jan. 1983)). If a claimant meets or equals a listed impairment, he/she is disabled. *Tackett*, 180 F.3d at 1099.

The United States Supreme Court has explained application of the Listing of Impairments:

> The listings . . . are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results. For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify. . . . "The level of severity in any particular listing section is depicted by the *given set* of findings and not by the degree of severity of any single medical finding – no matter to what extent that finding may exceed the listed value."
>
> . . .
>
> The [Commissioner] explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just "substantial gainful activity."

*Sullivan*, 493 U.S. at 530-531, (italics in original; citations omitted).

"While the Listing of Impairments does describe conditions that are generally considered severe enough to prevent a person from doing any gainful activity, an ALJ should not consider a claimant's 'impairment to be one listed in Appendix 1 solely because it has the diagnosis of a listed impairment. It must also have the **findings** shown in the Listing of that impairment.'" *Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990) (quoting 20 C.F.R. § 404.1525(d)); *Key v. Heckler*, 754 F.2d 1545, 1549-1550 (9th Cir. 1985)) (bold added).

Plaintiff bears the burden to prove that she has an impairment that meets or equals one of the listed impairments. *Tackett*, 180 F.3d at 1098. To "meet" a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his/her claim. *Tackett*, 180 F.3d at 1099. To "equal" a listed impairment, a claimant must establish symptoms, signs and laboratory findings at least equal in severity and duration to the characteristics of a relevant listed impairment. *Tackett*, 180 F.3d at 1099. Medical equivalence must be based on medical findings in the evidence

1  supported by medically acceptable clinical and laboratory diagnostic techniques. *Tackett*, 180 F.3d at

2  1100; 20 C.F.R. §§ 404.1526(b) and 416.926(b).

3         As a matter of law, the ALJ need not "state why a claimant failed to satisfy every different

4  section of the listing of impairments," in particular when the ALJ's evaluation of the evidence is an

5  adequate statement of the "foundations on which the ultimate factual conclusions are based." *Gonzalez*

6  *v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990). "An ALJ is not required to discuss the combined effects

7  of a claimant's impairments or compare them to any listing in an equivalency determination, unless the

8  claimant presents evidence in an effort to establish equivalence." *Burch*, 400 F.3d at 683; *see Lewis v.*

9  *Apfel*, 236 F.3d 503, 514 (9th Cir. 2001).

10         Plaintiff claims "severe" mental impairment based on Dr. Konkin's comments to suggest plaintiff

11  is depressed.  Plaintiff points to no evidence of a mental condition to significantly limit his ability to

12  perform gainful activity.  The record lacks medical findings of a mental impairment of the degree

13  claimed by plaintiff.  Plaintiff fails to demonstrate he suffers a "severe" mental impairment, especially

14  given the absence of meaningful treatment for it.  As of August 2003, plaintiff denied depression.  (AR

15  141.)  Plaintiff admitted that he received no treatment with a mental health professional.  (AR 310.)  As

16  for impairments, plaintiff has focused on hip and back pain, not a mental condition.  (AR 12, 47.)

17  Plaintiff fails to meet his burden to demonstrate a mental impairment based on passing references he

18  cites, including self-serving comments of his wife.

19                                    **Hypotheticals**

20         Plaintiff argues that the hypotheticals to Mr. Myer did not "contain" all of plaintiff's limitations

21  and that the ALJ relied on a hypothetical that did not reflect all of plaintiff's limitations.   The

22  Commissioner responds that "the ALJ properly included limitations that he credited as supported by

23  substantial evidence in the record."

24         In the final step of the five-step disability evaluation, the Commissioner has the burden to show,

25  in light of a claimant's residual functional capacity, he/she can engage in other substantial gainful work

26  that exists in the national economy.  *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001).  The

27  Commissioner "can meet this burden by propounding to a vocational expert a hypothetical that reflects

28  all the claimant's limitations." *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995).  Alternatively, the

1    Commissioner can refer to the Medical-Vocational Guidelines.  *Osenbrock*, 240 F.3d at 1162.

2        When vocational expert testimony is used, the vocational expert must identify a specific job or

3    jobs in the national economy with requirements that the claimant's physical and mental abilities and

4    vocational qualifications satisfy.  *Osenbrock*, 240 F.3d at 1162-1163.

5        An ALJ may properly "limit a hypothetical to those impairments that are supported by substantial

6    evidence in the record."  *Osenbrock*, 240 F.3d at 1165.  An ALJ may so limit a hypothetical even when

7    medical evidence conflicts.  *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989).  "An ALJ is free

8    to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence."

9    *Osenbrock*, 240 F.3d at 1165; *see Magallanes*, 881 F.2d at 756-757.  The parameters of an ALJ's

10   hypotheticals need not "include any alleged impairments that the ALJ has rejected as untrue."  *Long v.*

11   *Chater*, 108 F.3d 185, 188 (8th Cir. 1997).  An ALJ is not bound to accept restrictions in a hypothetical

12   question of claimant's counsel.  *Martinez v. Heckler*, 807 F.2d 771, 773 (9th Cir. 1986).

13       Plaintiff fails to substantiate deficiency in the ALJ's hypotheticals.  As to the hypothetical on

14   which the ALJ relied, the ALJ included impairments supported by substantial evidence in the record.

15   The ALJ properly rejected restrictions unsupported by substantial evidence.  The ALJ's use of

16   hypotheticals is free of errors claimed by plaintiff.

17                              **CONCLUSION AND ORDER**

18       For the reasons discussed above, this Court finds no error in the ALJ's analysis and that the ALJ

19   properly concluded plaintiff is not disabled. This Court further finds the ALJ's decision is supported by

20   substantial evidence in the record as a whole and based on proper legal standards. Accordingly, this

21   Court DENIES plaintiff's request to reverse the Commissioner's decision to deny plaintiff disability

22   insurance benefits or to remand for further proceedings. This Court DIRECTS the Court's clerk to enter

23   judgment in favor of defendant Jo Anne B. Barnhart, Commissioner of Social Security, and against

24   plaintiff Eric T. Thompson and to close this action.

25       IT IS SO ORDERED.

26   **Dated:    October 10, 2006**          **/s/ Lawrence J. O'Neill**
     66h44d                          UNITED STATES MAGISTRATE JUDGE

27

28